**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:  May 3, 2019
Draft Report:
Date Submitted:   April 17, 2019

David J. Bever, Esquire
Barros McNamara Malkiewicz & Taylor, PA
2 West Loockerman Street
PO Box 1298
Dover, DE 19903

William Morgan
179 New Castle Avenue
Felton, DE 19943

RE:   *In re:  Real Estate of Billy Keith Hunsucker and William Morgan*
        C.A. No. 9566-MG

Dear Counsel and Mr. Morgan:

The last stage of a partition proceeding involves the distribution of proceeds from the sale of the partitioned property.  This dispute centers around whether the co-tenants are entitled to contributions for payments each made towards repairs, taxes, insurance, among other expenditures, and the allotment of the trustee's fees and costs.  This is my final report.

## I.    Background

This is a decree for distribution in a partition action filed by Billy Keith Hunsucker ("Hunsucker") against William Morgan ("Morgan") on April 22, 2014 seeking to partition property ("Property") at 36 Railroad Avenue, Camden-Wyoming, Delaware. Hunsucker claimed he and Morgan owned the Property as tenants in common pursuant to a deed executed on April 22, 2009 between Russell Edward Morgan ("Decedent") and Hunsucker and Morgan, who received equal interests in the Property as tenants in common.

The Property includes a house and two apartments. The order for sale in partition was granted on September 21, 2017, the partition sale held on November 10, 2017, and a motion filed to set aside the sale was filed on November 16, 2017. Following a hearing on the motion, on November 21, 2017, I ordered the partition sale set aside, a second partition sale conducted, and the costs associated with the second partition sale paid out of Morgan's share of the partition proceeds.[1] Exceptions were filed, and, after briefing, the Court overruled the exceptions and affirmed the Master's November 21, 2017 Order on May 8, 2018.[2] A second

---

[1] Docket Item ("D.I.") 63.

[2] D.I. 71.

partition sale was held on August 17, 2018, and the return of sale for the second partition sale was approved by the Court on October 2, 2018.[3]

Morgan filed a motion on November 30, 2018 asking the Court to distribute the sale proceeds equally to him and Hunsucker.[4] Hunsucker's December 20, 2018 answer to the motion seeks to reduce Morgan's share of the proceeds to reflect the value of Morgan's occupancy of the house rent-free, the cost of the repairs, improvements, taxes, water, sewer and other expenses that Hunsucker paid related to the Property, and losses due to Morgan's failure to make repairs to the house on the Property.[5] Morgan responded on January 22, 2019 that he is entitled to receive one-half of the sale proceeds as tenant in common with Hunsucker, that Hunsucker's calculation of the Trustee's fees and costs owed by Morgan is incorrect, that Morgan made repairs to the Property, and that no rent is due because Hunsucker could have used the house.[6]

The hearing on the distribution of proceeds was held on March 18, 2019, I reserved my decision, and the record was held open until April 8, 2019 to allow for the filing of supplemental evidence by the parties.

---

[3] D.I. 77.

[4] D.I. 82.

[5] D.I. 85.

II.  **Analysis**

This is my decision regarding the distribution of the partition sale proceeds. First, the proceeds remaining to be distributed following the second partition sale of the Property are $97,107.15, after $9,367.15 in Trustee's fees and costs are subtracted from $106,474.30 in sale proceeds.

Next, Morgan and Hunsucker each own 50% of the property based upon the deed dated April 22, 2009.[7]

Hunsucker and Morgan's claims for offsetting profits received and liabilities incurred related to the Property in the process of dividing the partition sale proceeds, and the assessment of the Trustee's fees and costs, are addressed in turn

---

[6] D.I. 89.

[7] With Morgan's answer filed on June 6, 2014, he filed a counterclaim in which he sought the imposition of a resulting or constructive trust on the Property because he alleged the Decedent conveyed the Property in order to be eligible for Medicaid benefits if he needed to enter a nursing home and intended that the Property be divided among his six heirs upon his death. D.I. 5. Hunsucker argues the counterclaim was abandoned because there was no mention of it by Morgan during the lengthy case proceedings and Morgan confirmed, in his November 30, 2018 Motion, that he is entitled to one-half of the balance of the proceeds as co-owner of the property. D.I. 82. Hunsucker also noted that court orders for both the first and second partition sale concluded that Hunsucker and Morgan "hold as tenants in common in fee simple all the lands and premises mentioned and described in the [partition petition]," and no exceptions were filed related to that holding. D.I. 57; D.I. 74. At the March 18, 2019 hearing, Morgan withdrew the counterclaim, stating that he did not wish to pursue it. Trial Tr. 89: 17-23.

below. The party claiming contribution for repairs, improvements, taxes or other costs has the burden of proof.[8]

## 1. Apartments' Income and Expenses

The two one-bedroom apartments on the Property are rental properties and have been rented, except for limited transitional periods between tenants, continuously during the time period at issue in this case. Up until October of 2013, Hunsucker and Morgan jointly managed the renting of the two apartments and placed income into, and paid expenses out of, a joint bank account.[9] After their falling out, the arrangements worked out that Hunsucker managed rental arrangements for Apartment #1 and Morgan managed the rental of Apartment #2. Both apartments rented for approximately $600 per month, and Hunsucker and Morgan each kept the rental income from, and generally paid repair expenses on, the apartment they individually managed.[10] Income and expenses related to the co-tenants' management of their respective apartment will not be considered as offsets

---

[8] *Cf. Estate of Weber v. Weber*, 2014 WL 589714, at *6 (Del. Ch. Feb. 17, 2014).

[9] There is an issue pertaining to the distribution of funds from the joint account in which rental income for the two apartments was placed. There was testimony that $15,000 from the Decedent's estate was placed in that joint account and that, on September 17, 2013, Morgan withdrew $15,000 from that account and distributed those funds among the heirs to the Decedent's estate, except him. Trial Tr. 40: 23 - 41: 18; 42: 6-8; *see also* Pl. Tr. Ex. 9. The joint account was closed on October 24, 2013. Pl. Tr. Ex. 10. Issues related to the Decedent's estate, including the distribution of estate funds, are not properly addressed through this partition action.

[10] Trial Tr. 18: 22 - 19: 4.

to the partition sale proceeds, since the co-tenants' arrangement was for each to manage one apartment with equal rental potential and there was no evidence that expenses incurred for the apartments were dissimilar.

### 2. Contribution for Payments on Taxes or Insurance for the Property

Hunsucker and Morgan both claim offsets for their respective payments of taxes and insurance on the Property. Co-tenants share taxes and insurance costs equally even if one cotenant has exclusive possession of property.[11] After review of the evidence, I calculate that Hunsucker paid $2,311.57, and Morgan paid $8,759.57, in taxes and insurance on the Property.[12] Hunsucker's share of the sale

---

[11] *Estate of Weber*, 2014 WL 589714, at *5 ("Delaware law requires cotenants to share equally the taxes imposed on jointly-owned property and insurance costs associated with the property, even when one cotenant has exclusive possession of the property.") (citations omitted); *see also In the Matter of Real Estate of Turulski*, 1993 WL 18767, at *5 (Del. Ch. Jan. 21, 1993) (co-tenant is reimbursed for payments on taxes related to partition sale proceeds distribution).

[12] The parties each have the burden of providing sufficient proof of their claimed contributions, including cancelled checks or receipts, to show that the expenses or damages claimed are proven to a reasonable certainty and are not speculative or conjectural. *See generally H & H Brand Farms, Inc. v. Simpler*, 1994 WL 374308, at *5 (Del. Ch. June 10, 1994). Here, the parties were allowed additional time to include supplemental proof of expenses in the record. The evidence supports Hunsucker's claim for contribution for 2014 taxes paid on the Property, in the amount of $1,719.57, and $592.00 for insurance on the Property paid in 2017 (based upon Hunsucker's testimony). Morgan's evidence shows that he made monthly insurance payments on the Property between February 24, 2014 and September 13, 2017 (except for November 2016 through January 2017). Those payments totaled $4,962.45. Morgan also paid $3,797.12 in taxes on the Property in 2015 and 2016.

proceeds will be reduced by $3,224.00, or one-half of $6,448.00, which is the difference between what he paid and what Morgan paid for taxes and insurance.

### 3. Morgan's Possession and Control of the House

Hunsucker claims the value of sole and exclusive use of property by Morgan was $43,200 and Morgan should be assessed one-half or $21,600. Morgan asserts that no rent is due as Hunsucker could have occupied and used the property equally with him but chose not to. A co-tenant living on property has no obligation to pay rent unless the co-tenants agreed that rent would be paid.[13] However, if a co-tenant ousts another co-tenant, then rental value for the benefit received by the co-tenant in exclusive possession may be set off against payments made by the co-tenant in exclusive possession.[14]

Teresa Bell ("Bell"), the Decedent's daughter, testified at the hearing concerning occupancy of the house between 2013 and 2019.[15] At the time of Decedent's death in June of 2013, Morgan and Russell Morgan, Jr., another of the Decedent's sons, lived in the house. Morgan moved out of the house in July of

---

[13] *Estate of Gedling*, 2000 WL 567879, at *13; *see generally Fuqua v. Fuqua*, 750 S.W.2d 238, 246 (Tex. App. 1988) *writ denied* (Sept. 28, 1988).

[14] *Estate of Turulski*, 1993 WL 18767, at *5 (denying claims for payments towards maintenance and utilities on property where a co-tenant lived rent free); *see generally Jeffress v. Piatt*, 370 S.W.2d 383, 386 (Mo. 1963); *Goforth v. Ellis*, 300 S.W.2d 379, 383 (Mo. 1957).

[15] Trial Tr. 154: 13 - 159: 14.

2013, and Russell Morgan, Jr. moved out in April of 2014. In October of 2013, after Morgan and Hunsucker had a falling out, Morgan changed the locks on the house.[16] Morgan refused to give Hunsucker a key to the Property until mid-January of 2016, when Hunsucker had the broken boiler/heater in the house fixed to make the house livable again.[17] During this time period, Hunsucker communicated his desire to jointly rent the house but Morgan refused to do so.[18] Between April and September of 2014, Bell testified that no one lived in the house. Morgan moved back into the house for approximately one month and then the house was again left vacant until Bell moved into the house in July of 2015, staying until January of 2016, with Morgan joining her at times. Bell moved out of the house in January of 2016. She testified that she moved back in August of 2016, remaining until December of 2016. Bell's testimony conflicted with Hunsucker's, who testified that the house was only vacant briefly during the time he was fixing the heater. Morgan testified that he had resided in the house on and off between 2013 and 2016, but he was not clear as to the exact dates when he lived there. There was evidence that throughout this time period, family members kept their belongings in

---

[16] Trial Tr. 13: 11-18; 174: 10-19.

[17] Trial Tr. 13: 23-24; 27: 9 - 28: 4.

[18] Def. Tr. Ex. I (July 21, 2014 Letter from B. Hunsucker to W. Morgan) ("As I explained to you that we have already lost tens of thousands of dollars in rent revenue, after I rode all the way down to Dagsboro, you refused to rent the property and I still do not have the keys, saying there are only two rentals on the property, not three.").

the house (except there was no evidence that Hunsucker did so), and others outside of the family may have lived in the house with Morgan's permission.[19]

I find Morgan had exclusive possession of the house, benefitting from the use of the house, between October of 2013, when he changed the locks on the house ousting Hunsucker, and mid-January of 2016, when Hunsucker was provided a key to the house and accessed the house to fix a broken heater.[20] He resided in the house intermittently during that time and, even when he was not living in the house, he controlled the occupancy of the house. Given the on-going partition action (which commenced in 2014), the dispute between Hunsucker and Morgan, and Morgan's actions with regard to possession of the house, I find Morgan ousted Hunsucker from the house between October of 2013 and mid-January of 2016.

The difficulty is how to determine the rental value to be attributed to Morgan during the time he had exclusive possession of the house. If Morgan had not occupied that house, it could have been rented and the co-tenants would have shared the income and expenses equally. Hunsucker testified that he had "looked

---

[19] Def. Tr. Ex. H (Sept. 1, 2016 Letter from B. Hunsucker to W. Morgan) ("[a]t first you said the house was not a rental, but now you have tenants in there").

[20] The receipt for the heater repair is dated January 20, 2016. Pl. Tr. Ex. 5. I include one-half of January of 2016 in the time period during which Morgan exclusively possessed the house.

up" the "fair rental price" for a four-bedroom house in the area, which could rent for $2,000 to $2,500 per month, although he stated that, based upon the house's condition, it could rent for $1,000 or $1,400 per month.[21]  This is the only evidence about rental value that was provided by either party.[22]  Although it would have been preferable to have more evidence concerning comparable rental values in the area during the relevant time period, I find it reasonable, under the circumstances, to use the lay testimony provided as the basis for rental value in this case.[23]  I rely on the lowest estimate provided, or $1,000 per month, which adds up to $26,500 for the 26 and one-half months between November of 2013 and mid-January of 2016.  The proportionate rental value attributable to Morgan for this period is one-half of the total rental value, or $13,250, and Morgan's share of the sale proceeds will be reduced by $13,250.

4.  **Repairs or improvements to the Property**

In the absence of agreement or consent by the other co-tenant, a co-tenant in sole possession is not entitled to contribution from other co-tenant for repairs to

---

[21] Trial Tr. 52: 8-16.

[22] I confirmed at the end of the hearing that the issue of rental value of the house remained open for submission of supplemental evidence. Trial Tr. 186: 16-23.

[23] *Cf. State ex rel. Smith v. 0.15 Acres of Land*, 164 A.2d 591, 593 (Del. Super. 1960), *aff'd*, 169 A.2d 256 (1961) ("[i]n an ordinary case, the owner of a leasehold should be permitted to testify as to the value of his leasehold").

property.[24] With respect to improvements to the property, a court may, as a matter of equity, compensate a co-tenant proportionally out of sale proceeds in a partition for improvements made by one co-tenant if "those improvements have enhanced the value of the property."[25] To be entitled to contribution from sale proceeds, a co-tenant must show that the other co-tenant agreed to the repairs or that improvements enhanced the property's value. Hunsucker and Morgan submitted claims seeking contribution for repairs each of them made related to the house or the Property.[26] However, the only claims that meet the criteria required to obtain contribution for repairs on property in a partition are Hunsucker's $1,500 expense to repair the heater in the house on January 20, 2016, and the $184.89 Hunsucker paid for supplies to fix the house's porch in order to sell it.[27] Other requests for contribution, including requests for tree removal, pest control service costs, electric or plumbing work, or other expenses, are denied, either because there is no evidence that the parties agreed to the repairs or there is not sufficient

---

[24] *Estate of Weber v. Weber*, 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014).

[25] *Id.*

[26] I deny Hunsucker's claim for loss associated with Morgan's failure to maintain the Property, since he has not met his burden of showing a basis, or a reliable measure, for such a claim.

[27] Hunsucker also submitted claims for labor costs on a spreadsheet that detailed his total costs associated with the Property. I do not find that the labor costs and other expenses provided by Hunsucker are sufficiently detailed or reliable to be entitled to contribution from sale proceeds.

11

documentation showing payment for the repairs, such as cancelled checks or credit card receipts. Hunsucker is entitled to contribution for the $1,684.89 he paid in documented repairs to the Property, and Morgan's share of the sale proceeds will be reduced by $842.45, or one-half of $1,684.89.

5. **Other claimed contributions**

Both Hunsucker and Morgan submitted water and sewer expenditures for the Property. Morgan's claims for water and sewer expenditures for the house are denied since he had exclusive possession of the house and he, or those he allowed to stay at the house, benefitted from those expenditures.

Water and sewer bills for both apartments on the Property are combined, and reliable evidence, including cancelled checks or stamped receipts on the bills, was submitted showing that Morgan paid $1,944.90, and Hunsucker paid $1,088.11, towards those costs during the relevant time period.[28] Hunsucker's share of the

---

[28] Morgan's payments on water and sewer for the apartments, which were evidenced by invoices and cancelled checks included payments made on April 11, 2014 ($77.88), May 29, 2014 ($461.76), July 29, 2014 ($126.54), October 14, 2014 ($193.88), January 19, 2015 ($222.74), April 12, 2015 ($213.12), July 5, 2015 ($222.74), October 19, 2015 ($203.50), and January 7, 2016 ($222.74). Hunsucker's payments were evidenced by invoices stamped that payments were "received" on July 15, 2016 ($165.02), May 1, 2017 ($221.80), July 24, 2017 ($215.17), October 27, 2017 ($201.88), January 29, 2018 ($162.04), and July 5, 2018 ($122.20). Invoices which had a handwritten notation of "paid" and check number, without copies of relevant cancelled checks, were not deemed sufficiently reliable to be included.

sale proceeds will be reduced by $428.40, or one-half of the $856.79 difference in payments made by Morgan and Hunsucker.

Morgan claims an offset for his documented $500.00 for rental permits for the Property for 2013 through 2016.[29] I consider these claims in the context that they benefitted both parties equally since they each rented one of the apartments. Hunsucker's share of the sale proceeds will be reduced by one-half of $500.00, or $250.00.

### 6. Trustee fees and costs

The Master's November 21, 2017 Order provided that "Trustee's costs associated with the second partition sale should be paid out of [Morgan's] share of partition proceeds."[30] The Trustee incurred $8,163.00 in fees and $1,204.15 in costs, or $9,367.15 total, for the partition proceedings in this case.[31] Hunsucker claims Morgan should be assessed $4,852.75 individually for expenses associated with the second partition sale. Morgan argues that he should not be assessed for fees incurred related to Hunsucker's exceptions to the November 21, 2017 Court

---

[29] The evidence showed a rental permit for the Property from the Town of Wyoming cost $125.00 per year.

[30] D.I. 63.

[31] D.I. 78.

13

Order, and any fees incurred after the August 17, 2017 sale should be divided equally.

Hunsucker filed exceptions to the Master's November 21, 2017 Order, which were denied by the Court, and the November 21, 2017 Order was approved by the Court, on May 8, 2018. Following that approval, the Trustee commenced actions to conduct the second partition sale, filing a proposed order for the second sale on June 28, 2018 and an amended proposed order on July 11, 2018. Consistent with the provision in the November 21, 2017 Order, Morgan is solely responsible for the Trustee's fees and costs associated with the second partition sale, including $3,917.00 in fees for work performed by the Trustee between May 9, 2018 and October 4, 2018, and $828.75 in costs incurred between June 30, 2018 and October 15, 2018, for a total of $4,745.75.[32] Trustee fees associated with Hunsucker's exceptions to the November 21, 2017 Order, in the amount of $214.00, and costs of $10.50, for a total of $224.50, are attributed to Hunsucker.[33]

---

[32] Trustee's fees and costs associated with the second partition sale include fees for work performed by the Trustee starting on May 9, 2018 "[setting] up conference call regarding second sale," and ending with Trustee's October 4, 2018 email with buyer's counsel regarding the sending of funds, and include costs from June 30, 2018 through October 15, 2018, such as the costs to advertise the partition sale in Delaware State News/Independent News Media, Inc. USA, on August 1 and 9, 2019. D.I. 78; *see also* D.I. 75, Ex. B.

[33] Trustee fees attributed to Hunsucker were incurred between December 14, 2017 and May 8, 2018, and costs were incurred on January 8, 2018.

The remaining fees ($4,032.00) and costs ($364.90) are divided equally between Morgan and Hunsucker.[34] Morgan's share of the Trustee's fees and costs is $6,944.20, and Hunsucker's share is $2,422.95.

## III. Conclusion

For the reasons set forth above, I recommend the Court find that Hunsucker is entitled to receive $61,004.25, and Morgan is entitled to receive $36,102.90, from the sale proceeds of the Property. An explanation supporting these calculations is attached to this report. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

---

[34] Subtracting Trustee fees attributed to Morgan ($3,917.00) and fees attributed to Hunsucker ($214.00) from the total fees due ($8,163.00) leaves $4,032.00 or $2,016.00 each. For Trustee costs, the costs attributed to Morgan ($828.75) and Hunsucker ($10.50) are subtracted from the total costs of $1,204.15, leaving $364.90 in costs to be shared equally, or $182.45 each.